Good afternoon, Your Honor. Jose Zeldon Cepeda, California Attorney General's Office for the State Defendants. I will be sharing time with counsel for co-defendant at the International Brotherhood of Teensters Equally, who will be represented by Mr. Andrew Kushner. All right. Can you watch your clock, please? Thank you, Your Honor. At this point, I would like to reserve three minutes for rebuttal. All right. May it please the Court, this case presents the question of whether a generally applicable state law that merely defines an employee for purposes of state labor protections and does not in any way reference motor carriers is preempted by the Federal Aviation Administration Authorization Act, or EAPQA for short, which preempts local laws that relate to the prices, routes, or services of motor carriers. The District Court erred in concluding that the ABC test under Assembly Bill 5 is preempted and in otherwise concluding the plaintiffs met their burden to worry in preliminary injunctive relief, and we respectfully ask that this Court reverse that determination. In passing the FQA, Congress sought to deregulate the motor carrier industry so that competitive market forces drove the particular motor carrier operations, but Congress did not mean to display state laws in traditional areas of state regulation. So, for example, Congress was concerned with barriers to entry, tariffs, price regulations, and laws governing the types of commodities that a carrier could transport. On the other hand, generally applicable state transportation and safety, welfare, or business rules that do not otherwise regulate prices, routes, and services are not preempted. So the caseload states... Counsel, Judge Benitez said that the Court repeatedly invited the state to explain how the ABC test was not an all-or-nothing test, how a motor carrier could contract with an independent owner-operator as an independent contractor rather than as an employer, and neither the state nor the Teamsters was able to do so. So I'll ask you the same question that Judge Benitez did. Can you explain to me how the ABC test, particularly B, is not an all-or-nothing test here? Your Honor, the language of the... There's a couple of answers to... There are two aspects to our answer to that. First, the all-or-nothing language comes from this Court's decision in the ATA case versus the City of Los Angeles, which involved a concession agreement for the Port of Los Angeles and Port of Long Beach. And what is important to contrast what's at issue here, a general classification... No, but, Counsel, I don't want to interfere with your argument, but I'd like you to answer the question that I asked and that Judge Benitez asked. Whether it's relevant or not, do you agree that this is here an all-or-nothing test and that with prong B, there can never be independent contractors rather than employees doing the work at issue here? Your Honor, on this record, it's difficult to make that determination because we do not have a particular model of a particular business entity that is raising this. What we have here instead is an association of motor carriers who are saying, this is the way generally motor carriers operate, and therefore, under these particular circumstances, it's impossible for our motor carriers to meet the particular ABC test standard, and therefore, that has a practical effect. But when would they... I'm sorry. Go ahead. Follow up your question. I'll get the next one. When would there ever be a circumstance here where the worker would be performing work that is outside the usual course of the hiring entity's business in this kind of a case? I think that's what Judge Benitez was getting at, and I understand why you were unable to provide Judge Benitez as an example, but how could there ever be? Your Honor, I understand that given the particular factual allegations that plaintiffs are raising, it would be very difficult given the way that the ABC test is framed, but I'd submit to the court that that is not the primary consideration because what Judge Benitez did not do and which the case law says the court has to do is assess whether that relates to the prices, routes, and services of the motor carrier. And what the case law says is that generally applicable state transportation business rules that do not otherwise regulate prices, routes, and services are not preempted. So the laws that directly regulate such as setting prices or mandate particular routes are preempted, and similarly laws that indirectly regulate prices, routes, and services are preempted. The ABC test does neither of these things. So what Judge Benitez did not do is assess, assuming it's correct and we do not necessarily concede that, then what effect does that have on the prices, routes, and services of a motor carrier? Because Congress did not intend to displace all state regulation, particularly in the context of labor regulation, which this court has upheld, both in Mendonca and Diltz and most recently in Ridgeway. And this court has held that if the laws do not bind a motor carrier to provide a particular price, route, or service or the presence of a price, route, or service is essential to the operation of the law, it is not preempted. And we submit to the court that under that precedent, the district court's decision cannot stand. I just wanted to get back to the point you initially made in response to Judge Benitez' question about the relevance of the all-or-nothing test. I was a little confused because the American Trucking Association v. City of Los Angeles case seemed to start with the ruling that the concession agreements related to a price, route, or service and so was preempted unless saved by the safety exception, I think it was. The court says that the ruling was left unchallenged in this appeal. And the district court says it's undisputed that it relates to price, route, or service. So I'm wondering about what is the relevance of the holding in American Trucking Association v. City of Los Angeles other than that the safety exception didn't apply in that case. Your Honor, that particular case involved a regulation or a concession agreement that directly targeted motor carriers and that mandated specific phase-out of independent contractors over a period of years and said that the motor carriers have to give preference to particular types of employees. So it was a direct regulation or at a minimum indirect regulation of the motor carrier operations. And was it disputed that it related to prices, routes, and services? I thought it was undisputed that it related to prices, routes, and services and the court didn't even consider that issue. Yes, that's correct, Your Honor. In the APA case, it was undisputed. The court cited the provisions of the agreement and that said it's undisputed. We agree with the district court that it does relate to a price, route, and service. Didn't we specifically say that the concession agreements relate to prices, routes, and services of motor carriers can hardly be doubted? In that particular case, Your Honor, that is what this court said given the particular provisions. And I see my time is short and I'd like to leave time for rebuttal. Thank you, Your Honor. Andrew Kushner for International Brotherhood of Teamsters. I'm prepared to address all the issues in the case, but I'd like to start with Judge Bennett's question about whether this is an all-or-nothing rule. And the relevant question, Your Honor, is not whether the ABC test is an all-or-nothing rule, but whether AB 5 is in total. And like the state, we agree that this appeal does not turn on the question whether a motor carrier should be permitted to classify a driver as an independent contractor. But if this court does believe that that's necessary, there is the business-to-business exception in the statute, which permits in legitimate business-to-business contracting situations for motor carriers to contract with owner-operators and to treat them as independent contractors. The state has never claimed the business-to-business exception applies in this case, correct? Neither in the district court nor on appeal? That's not true with respect, Your Honor, at oral argument in the district court. The state said that it would apply in these circumstances, and I certainly don't want to speak for my colleague, but there is that portion of the transcript. But more fundamentally, of course, the application of that portion of AB 5 would be decided by courts in individual cases. It's not the state's call whether or not that would apply. And I would just say on the application of the business-to-business exception, the district court relied solely on an interpretation of the business-to-business exception in a California state trial court decision that has since been called into serious doubt because the California Supreme Court has directed the Court of Appeal to review that decision. And so the plaintiff's theory is that no motor carrier could ever contract with an owner-operator and classify them as an independent contractor. That requires that they demonstrate that the business-to-business exception is foreclosed for motor carriers, and they haven't made that showing. I'm sorry. So if they demonstrate that B of ABC would be otherwise applicable, that their burden, in your view, to get a preliminary injunction is that they would have to show that the business-to-business exception could never help any of them? Their theory of preemption, Your Honor, is that there is a blanket rule that every owner-operator must be classified as an employee under AB 5. For them to prevail in that theory, they have to show not only that the ABC test precludes classifying a driver as an independent contractor, but the business-to-business exception as well, because that's an alternative to the ABC test that appears in the statute and that provides that the Borrello standard governs, which this court has already upheld in the CTA decision. Right. It's saying that it might be a different case if it were the ABC test. You're absolutely right, Your Honor. This court disclaimed any sort of interpretation or ruling on the question whether the ABC test was preempted in the CTA decision. And this court reiterated the fundamental principles of this court's F-Quad-A jurisprudence in that decision. It held that, as my colleague argued, generally applicable labor regulations are not preempted by the F-Quad-A because they're one of many variables that goes into determining the prices, routes, and services of motor carriers. And Judge Woodlock's decision in the Martins case is exactly consistent with this principle in recognizing that what the F-Quad-A regulates are outputs. Or it regulates, I'm sorry, it preempts regulations on outputs and does not preempt regulations of inputs, things like background labor regulations, because those laws, those state laws, are only one of many variables that help determine the prices, routes, and services of motor carriers. They are not themselves laws that bind motor carriers to specific rates, routes, and services. Doesn't this raise the larger issue that I think both Judge Okuda and Judge Bennett are touching on, the way in which this litigation's been sculpted? It's sculpted in a way that makes it very difficult for us to make those kinds of discrete determinations here. And what we're being asked to do is opine in a very broad way about things that perhaps should be presented in a much more discrete fashion, a much more developed fashion. You know, the all or nothing is not just some language from Sue. It's a suggestion of the litigation strategies that the parties have adopted in this case, which makes it much more difficult for us to do our job of making careful analysis. I think, Your Honor, the reason why CTA has litigated this case under the theory that AB 5 is an all or nothing rule is because this court has already recognized that the substantive requirements of California employment law can be applied to motor carriers without offending the F-Quad A. Except when they can't. And the problem is that we're talking about this range between things that are connected to other things, because everything's connected to everything else, as Judge Scodino teaches us. And on the other extreme, this kind of general view that everything that is a matter of labor relations cannot be preempted. And I'm not sure that this case makes it possible for us to decide where in that spectrum that is. What we know, Your Honor, is that background labor regulations can be preempted when they preclude trucking companies from contracting with owner-operators, because that's the situation that this court ruled on in the ATA decision. And short of that, What is the evidence that we have that that's true here? There's no evidence. Evidence, not speculation. Evidence. Your Honor, there's no evidence in the record that motor carriers will be precluded from contracting with owner-operators. In fact, to the contrary, there is a concession by CTA that owner-operators can continue to be utilized by motor carriers under AB 5. That's not a concession. That's a hostage to fortune that you've placed in your litigation strategy. Really, you know, there's a lot of posturing that's going on in this litigation and another litigation like it. And it's challenging for the courts to make the kinds of determinations that they're going to make. And so whether there's a concession or not, and I'm not sure that it's a concession, but whether or not there's some agreement in some fashion, we still have no evidence about how this actually works, how it is that people are, it's difficult for the owner-operator to function in this context. What we do know is that there's been a dramatic drop in union representation, which suggests a different development in the labor relations at the ports. Let me just pause for a moment. I think there's a problem with the time. Support room deputy, I think you gave 20 minutes to Mr. Kushner, but he was splitting time with Mr. Zeldon Zepeda. Is that correct? Yeah, I've been watching the clock and I agree. I think I was going to turn it back. Support room deputy, stop the clock now. Okay, and the remaining minutes, two minutes and 25 seconds can be kept by Mr. Zeldon Zepeda and Mr. Kushner for rebuttal. And then Mr. Tauberg would get 20 minutes. Okay, okay. Okay, I apologize. I should have caught that earlier, but at least I've got it now. And I think so for rebuttal. What time would you like me to put for the rebuttal? Two minutes and 25 seconds. Yes, ma'am. Thank you. Mr. Tauberg. Thank you, Your Honor. Good afternoon. May it please the court. Andrew Tauberg on behalf of plaintiffs appellees. The defendant's principal argument today orally is that AB 5 cannot possibly be preempted by the F quad A because it is a law of general applicability. That is a false characterization of AB 5 and also an inaccurate description of the law. AB 5 is not a law of general applicability. It contains numerous exceptions for numerous industries and professions categorically and contains other exceptions for other industries and professions that are conditionally available to those industries. It actually specifically targets the trucking industry. We have pointed the court to the statements of the author of AB 5 on the floor of the legislature when she was explaining the purpose of AB 5. She says, I want to talk about trucking. And she says that AB 5 was designed to eliminate what she characterized as the outdated model whereby motor carriers use independent owner operators to deliver services to their customers. So it simply cannot be maintained on the record that this is a law of general applicability. But even if it were a law of general applicability, it still is subject to preemption under the F quad A. This court has repeatedly recognized in various cases that laws of general applicability might be subject to preemption of the F quad A. And the Supreme Court in interpreting the Airline Deregulation Act, which is the model for the F quad A's preemption provision, has specifically held in two different cases that laws of general applicability are in fact subject to preemption. Yes, Your Honor. Let me ask you this. So we have a line of cases looking at labor laws and changes to labor laws that affect motor carriers. And in every case we've said they're not preempted. And so how is this law different? And how is the effect so much more significant on the trucking industry so that we should say it's preempted? Yes, Your Honor. The two principal cases that the defendants cite and that I presume Your Honor is alluding to, finding no preemption under the F quad A, are of course the Diltz decision and then the Mondanka decision. Both the Diltz decision held that the underlying meal and rest break law was not preempted by the F quad A, and then Mondanka held that the prevailing wage law was not preempted by the F quad A. But the critical thing to note about both of those cases is that in both of those cases, the court was dealing with drivers who were unquestionably employees. They were already categorized as employees by their employers and moreover drivers who were driving company owned trucks. So there, the marginal effect of requiring adherence to either the prevailing wage law or the meal and rest break law was rather minimal. And indeed, in Diltz, the concurring opinion observed that the motor carrier there offered no evidence at all with respect to an effect on rates and, excuse me, on routes and services. And the only evidence of an effect on rates was of a minimal effect. Here, by contrast, we have presented through several affidavits, testimony and expert report, evidence that supports the fact that there will be a significant effect here. Because unlike the situation in Diltz and Mondanka where the drivers at issue were already classified as employees. Here, we're talking about motor carriers who are using owner operators who are classified as independent contractors and would be compelled. The motor carriers would be then compelled to reclassify them as employees and afford them all the benefits employees are entitled under California labor law. And that is a sea shift of major proportions. The motor carriers would not only have to hire the employees, they would have to then acquire trucks for those employees to drive. They would have to get storage sites for those trucks. They'd have to maintain the trucks. They'd have to build HR departments in order to manage everything that you need to manage with employees, be it compensation, be it record keeping and all of that. And so the effect of AB5 is to prevent motor carriers from contracting with owner operators as independent contractors and compels motor carriers to instead shift to an all employee workforce using company owned trucks. And it is that complex. Can we distinguish Sue on the same basis? And Sue was, I guess, upholding the Borrello test. I guess the other case more recently is Ridgway. Are those distinguishable on the same basis? Well, Ridgway, I'd say, just basically follows Diltz and Mondanka. And my understanding is a similar factual situation there. In CTA versus Sue, this court clearly said that an all or nothing test is likely preempted. I don't think that's right because I don't think that, I don't think CTA versus Los Angeles seems completely different because it was presumed that the concession agreement affected prices, routes and services. So let's talk about Sue taking, let's ignore that statement for the moment and explain how we can distinguish Sue.  Sue was addressing the Borrello test in contradistinction to the ABC test. And as this court expressly noted in Sue, unlike the ABC test and unlike the concession agreement in ATA versus City of Los Angeles, under the Borrello test, a motor carrier can lawfully contract with owner operators as independent contractors. The court said there is nothing in the Borrello test that compels the use of either employees or independent contractors. Is there a distinction other than it's not all or nothing because that doesn't seem, I mean, if I've ruled out that all or nothing is significant as an issue, I don't see anything in the F-Quad A, as you call it, that is based on that. If I may, Your Honor, if I can just for a second push back there, Your Honor, I think how this court rightly arrived at the all or nothing rule being preempted by the F-Quad A is through the services prong of the statute. Because as we know, the F-Quad A preempts any state law that would affect rates, routes, or services. And it is clear from both the Supreme Court's decision in Roe as well as the Third Circuit's decision in Bedoya that the term services encompasses not merely transportation of a good from point A to point B, but also encompasses the manner in which those services are provided. Well, in Roe, the person had to go up to the door and take the information about the cigarette smoker or something like that. That's exactly right. Whoever, whether it's an employee or an independent contractor, I don't see anything relating to services here. It's just the nature of the situation. Your Honor, I apologize for speaking over you, Your Honor. But the Supreme Court looked at that as a manner of service. I mean, that's exactly the language. The state of Maine defended its law in part on the basis that it supposedly had the right to exclude tobacco products from the state entirely. And therefore, the state argued it had the lesser right to regulate the manner in which they are delivered. And the Supreme Court expressly rejected that assertion, saying even if, assuming for purposes of argument, the state had the right to exclude such products entirely from its state, the F-Quad A does not allow it to regulate the manner in which those transportation services are provided. So the Supreme Court was looking at the signature authentication and the similar requirements imposed by the statute not as services, but as a manner in which services were delivered. Can we go to Ridgeway, which was the initial question that Judge O'Connor asked? And I'm not sure we can blow by it so quickly. That is to say that we're dealing with minimum wages. And, you know, Walmart argued that that increased their costs and it altered their pay systems. And maybe they even would think that they'd have to make changes in their HR department. But that's generally applicable to anybody in business when there is created a, call it a floor, for labor relations. And the reasoning in Ridgeway was pretty clear, that it didn't set prices. It didn't mandate or prohibit certain routes or tell carriers what services they may or may not do. And so what that does is tells us that in certain circumstances, where they are, I don't know on that spectrum, but in certain circumstances, the decisions about prices that are set or services that are used or routes that are used is really immaterial here. If it's generally applicable to everybody in the business. And that's what 4Q, however you say it. Your Honor, I would very much want to push back on the notion that defendants have urged here and that your Honor was articulating there. And the notion that generally applicable statutes are somehow immune from preemption under the F-Quad A. It's simply not the case. The F-Quad A preemption provision was modeled on the Airline Deregulation Act's preemption provision. And so cases interpreting the ADA's preemption provision are recognized to be illustrative or instructive for interpreting the F-Quad A's preemption provision. And the Supreme Court has issued two apposite decisions under the ADA that are directly relevant here. That would be the Morales decision and the Wolins decisions. And in both of those decisions, the court was looking at claims brought under consumer protection statutes. One was a false advertising statute. The other was a consumer fraud statute. But in any event, the Supreme Court was looking at claims brought under generally applicable statutes. There was no suggestion that either the false advertising statute or the consumer fraud statute were particular to airlines. Not at all. They were just the general statutes. And the court specifically held that, notwithstanding the fact that those statutes were generally applicable. They were nonetheless subject to preemption under the ADA and thus, by extension, generally applicable statutes are subject to preemption under the F-Quad A. If I could just quote to you from Morales for just a second. Could I interrupt you before you get started? Of course, Your Honor. Because Morales definitely was extremely broad. And the Supreme Court has been backed off of that since Morales. But we've gone even further. We're not that impressed by Morales or the Supreme Court cases, line of cases. And we've said, although generally applicable laws don't create a right line of rule, it certainly is strong. We give it a great deal of weight in determining whether there's preemption or not. So I don't think Morales is going to help you very much in the Ninth Circuit. So what do we say about the Ninth Circuit line of cases? Maybe if I can, I don't mean to distract from the question, but maybe put it on a broader point. If we recast this as a statute that's concerned about consumer protection broadly or competition, that's what this whole area is all about for purposes of preemption, as opposed to general rules of labor relations. If we cast it from that perspective, doesn't that tell us a little bit about the way in which the Ninth Circuit has moved in these kinds of cases and the justification for moving in these kinds of cases? I'm sorry to have gone from the very specific question Judge Okuda asked to a broader one, but I wanted to put it in that kind of context as a way of conceding. Your Honor, I really do not believe that the Ninth Circuit, and may I just interject? I don't see any clock in front of me, so I'm unfortunately not able to follow the time, but I don't believe that the Ninth Circuit has issued any blanket rule that supposedly generally applicable labor laws are immune from FQA preemption. It was decided specifically on the records in front of them. It's not immune, but that is that we give a great weight, and we've said that in Biltzman, NACA, and Ridgeway and numerous cases, and we do give, in fact, a great weight. Fair enough, but it's certainly a factor. I'm not suggesting it's not a factor. I'm sorry, another question was coming in. I didn't hear that. No, I was just going to say, Counsel, I don't see any Ninth Circuit cases that have abandoned the discussion in Morales that allowing laws of general applicability of pass would be creating an utterly irrational loophole. And so, I mean, from my perspective, none of our cases are contrary to what Justice Scalia wrote, that just having a law of general applicability does not give states a pass. I certainly agree with Your Honor, and obviously this court is bound by the Supreme Court's rulings. I don't think there is any tension between that and this court's previous cases, but if there were, obviously the Supreme Court's decision would trump. Actually, if we've interpreted the Supreme Court opinion subsequent to the Supreme Court opinion, we're bound by our precedent, whether it's erroneous or not. So that's why we need to focus on the Ninth Circuit cases, not on the Supreme Court cases. I'm happy to do so, Your Honor. So, again, I would like to point out that in, excuse me, Biltz, it was specifically pointed out that there the motor carriers did not offer any evidence as to effect on routes or effect on services, and the evidence they offered with respect to rates was only of a minimal, that's quoting the decision, effect. So, looking at the facts there, that is a one-time, fits those facts, doesn't fit our facts, because we have introduced different evidence. And to point back, again, hearkening to an ADA case decided by this court, the American Transport Association v. City of San Francisco, again, another decision along the lines that your court was pointing to, this court saying that a generally applicable law is not preempted by the ADA. But, again, the court took great pains to make sure that the reader understood that that was decided on that, the facts of that case, because in that case, A, the airline that brought the case admitted that it was not going to change its services as a result of this law, and B, the court specifically noted that it could well imagine an ordinance being passed that would impose a contract term on the airlines that was so onerous that it would run afoul of the ADA. Have we ever held that the F-Quad A has preempted a generally applicable labor law? I'm not aware of it, but I'm also not aware of this court ever being presented with a case in which it was asked to rule upon a classification rule that would prevent all motor carriers in the state of California from contracting with owner-operators as independent contractors. It was clearly contrary to congressional intent were that California law. Counsel, in the Ninth Circuit cases that I've looked at, there seems to be a very fact-specific type analysis of the impacts and not at a preliminary injunction review stage. How do you think that the standard of review that we have to apply here factors into that? Well, Your Honor, an ADA versus City of Los Angeles was initially decided on a preliminary injunction. Indeed, this court reversed the district court because the district court had not entered a preliminary injunction preventing the all-or-nothing rule at issue there. And subsequently, a couple years later, after a bench trial was held, the court then affirmed the final determination by the trial court that, indeed, the concession agreement there was preempted. But let's look at the record in this case. Is it more than simply there has been plopped into the record a series of documents and depositions and so on that someone could rely on? Or do we say that Judge Benitez, in fact, relied on that? Well, Judge Benitez issued his... He didn't really make a factual determination, did he? No, he made a very clear factual determination that motor carriers could not possibly comply with prong B of the ABC rule as adopted by the State of California, and that, therefore, the effect of the law, as a matter of fact, would be to compel motor carriers to switch from owner-operators to employee-drivers. It's a clear finding of fact. Now, it's certainly true that he did not go into detailed analysis of the specific effect on prices, specific effect on routes, specific effect on services. There is a lot of evidence in the record to support all of those contentions. They were introduced at the hearing that the judge held and through declarations by Mr. Yoden, Mr. Steffoli, and through our experts. So there is ample evidence in the record to support... Isn't this several steps beyond what previous cases that have made those kinds of discrete determinations have relied upon here? Well, the statute, Your Honor, is several steps beyond what the State of California has attempted to do before. And this is far more extreme than the statute that Congress expressly disapproved of when it enacted the F-Quad A preemption provision. When Congress was enacting the F-Quad A preemption provision, it identified what it referred to as a patchwork of state regulation that it thought undesirable. And one of the patches in that patchwork that it specifically disapproved of was a California statute that had discriminated against motor carriers that used owner-operators and in favor of motor carriers that used employee-drivers. So Congress is aware of California's discriminatory past and it explicitly rejected the discrimination against owner-operators used by motor carriers in this state. And elsewhere, Congress has, through Truth in Lending statute, with the regulations following that, Truth in Leasing statute, specifically anticipated that owner-operators would be a part of the nation's transportation system. And this court has recognized in all of its cases, and I think it was alluded to earlier by the State's counsel today, that one of the major motivations behind F-Quad A for Congress was to deregulate the trucking industry and eliminate barriers to entry. But AB 5, through its prohibition on motor carriers contracting with owner-operators as independent contractors, is a clear barrier to entry. If we look at this as an attempt to balance, I'm not sure how far we can go. I recognize that we have to inquire into Congress's intent. On the other hand, I'm a little uncomfortable with things that find their way into what's called legislative history as being truly historical. So then we look at a larger issue, which is Congress is trying to balance two things. One is they'd like to leave the states as laboratories to develop different ways of approaching things. And at the same time, they want to assure for their larger purposes the uniform standard. The uniform standard is directed, however, at what kind of competition is consistent with background labor rules. It strikes me. And to state that is simply to begin the conversation, not to end the conversation. And that's why I keep focusing on fact-finding as being necessary here. Your Honor, there are facts. I'm sorry. I apologize. There are facts in this record. There were expert reports. There were declarations from various people. There were documents attached to it. It's all in the excerpts. Not all of it, but the relevant bits are in the excerpts of record, and especially in our supplemental excerpts of record. So I don't think that there's a lack of facts. You don't have to look to the fact-finding that's done. It cannot be that kind of categorical fact-finding. I understand the pressures, the time pressures that the district court understood itself to be under to deal with a statute that was going to come into being, had come into being, actually, at the time that it was ruling. But the fact-finding is really quite conclusory by the district court. Whether or not there's stuff in the record is another matter. Your Honor, this court in ATA, and again in Sue, made abundantly clear that all-or-nothing rules are not permitted under the F-Quad A, that a rule that compels the use of employees is not permissible. That's different from all-or-nothing. That is, if the business model doesn't work in a way that is consistent with background labor principles or policies that the state of California has chosen, we don't make a choice of that. We simply look to see whether or not there is a fair balance of the two competing considerations, background principles and competition. But here, this is striking at the heart of competition. The evidence in the record is clear that the principal way small entrepreneurs enter the motor carrier industry is as owner-operators. They start out as owner-operators. They develop the skills. They develop the experience. They develop the reputation and build off of their experience as a one-truck contract with independent owner-operators. By preventing them as a way into the industry, you're going to have a consolidation amongst much larger companies and a decrease in competition. You're well over time. Could you wrap up, please? You're well over time. Could you wrap up, please? Yes. In ATA v. City of Los Angeles, this court clearly realized that a mandatory switch from owner-operators to employee-drivers would impose tremendous capital requirements on motor carriers and would drive people out of business. The state and PAC anchor pushed a UCL claim that was predicated on the very understanding that switching from owner-operators to employee-drivers has a significant market effect. They cannot possibly stand before this court today and deny the significant effect on the market of compelling the use of employee-drivers. All right. I think we have your argument. California has some time, so how are you planning to divide it? I will go ahead and take that, Your Honor. All right. I wanted to address multiple points. First, I wanted to go into an allusion to Mr. Talbert made about factual finding by the district court. The district court did not point to any evidence in regard when it made its conclusion. In fact, there were no depositions here. This tends to happen a lot of times in preliminary injunction types of cases. It was on declarations. In terms of whether the district court made a factual finding about the effect and whether the motor carriers cannot comply, there was no factual finding. The district court basically made its own determination based on what it thought the effect of the law would be given the particular allegations of the plaintiff. And this dovetails somewhat with the concern that Judge Woodlock raised regarding the way this case has been litigated. Plaintiffs brought this case as an association of motor carriers raising allegations about what their members would or would not be able to do. There is no, unlike situations like the ATA case or even the other ATA case versus City of San Francisco under the ADA, there isn't a particular business entity saying this is how we operate, this is how practically this will impact our situation. So because of the way the plaintiffs raised their allegations, we had to respond accordingly, and that explains the deficit in the record. And we submit that it does not support the district court's determination. This also impacts a question that was raised regarding the applicability of the business-to-business exception. The business-to-business exception involves, I believe, a dozen separate factors that are highly fact-specific. And plaintiffs basically said there's no way that we can comply with those. And we submit to the court, and the district court agreed with that, but we submit to the court that given the way the case has been litigated, there is no specifics about the particular businesses. We don't have a particular fact pattern, a particular business relationship where someone can point to and say we can apply those factors. So given that, our position has been that that particular exception could potentially apply in these circumstances, but because there is no specific business model, we cannot make that particular determination. And it's important to note that the business-to-business exception is the subject of litigation currently in the California Court of Appeal, which will hopefully make some determinations that will be helpful for that, and that will be argued in early December. Ultimately, I bring this back to the fact that this case is governed by Diltz, Mendonca, and Ridgeway. Mr. Tauber argued that those cases are distinguishable because of the particular labor rules that were at issue, for example. But this court has consistently applied those cases in factual situations that were different from that particular case, and would submit that based on the fact that this is a generally applicable law that does not regulate or relate to the prices, routes, and services of motor carriers, that the district court's conclusion to the contrary was incorrect. Ultimately, the FQA was not intended to immunize motor carriers from all state laws. So to the effect, as Justice Breyer wrote for the court in Roe, if a law affects motor carriers not as motor carriers, but as members of the general public, they are not preempted. The sky is not the limit, and preemption has to run its course at some point. For these reasons, we'd ask the court to reverse the district court's preliminary injunction ruling. All right. We thank all sides for their arguments in this very interesting case, the case of the California Trucking Association versus Xavier Becerra and International Brotherhood of Teamsters is submitted, and we're now adjourned for this session. Thank you. Thank you, Your Honor. Thank you, Your Honor.
judges: Ikuta, Woodlock, Bennett